ESTATE OF Robert F. LUTE II, by his Personal Representatives, James A. Lane, Kathleen M. Lute and Gene Krab; and the Robert F. Lute II Trust, by his Trustees, James A. Lane, Kathleen M. Lute and Gene Krab, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. 8:CV97–00118.

United States District Court,
D. Nebraska.

March 11, 1998.

Order Denying Motion to Amend
Judgment May 21, 1998.

R. Kevin O'Donnell, McGinley, Lane Law Firm, Ogallala, NE, for plaintiffs.

Sarabeth Donovan, Assistant United States Attorney, Omaha, NE, Robert D. Metcalfe, U.S. Department of Justice, Tax Division, Washington, DC, for U.S.

## MEMORANDUM OPINION

STROM, Senior District Judge.

This is an estate tax refund suit. The seminal issue is whether a renunciation executed by the decedent's father is a qualified disclaimer as defined in the Internal Revenue Code, 26 U.S.C. § 2518. If it is a qualified disclaimer, then the decedent's entire intestate estate "passed from the decedent to his surviving spouse" and qualifies for the marital deduction set forth in the Internal Revenue Code, 26 U.S.C. § 2056(a).

This case was tried to the Court on February 2 and 3, 1998. At the close of trial, the parties were invited to and have submitted post trial briefs. After careful consideration of the arguments of counsel and the evidence adduced at trial, the Court makes the following findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). First, however, the Court must rule on several exhibits received at trial subject to relevancy objections.

### I. OBJECTIONS TO EVIDENCE

The Court received the following exhibits at trial subject to relevancy objections. Having reviewed them, the Court rules as follows:

| | |
|---|---|
| Plaintiff's Exhibit 168(J) | —received |
| Defendant's Exhibit AA | —objection sustained |
| Defendant's Exhibit BB | —objection sustained |
| Defendant's Exhibit BB–1 | —objection sustained |
| Defendant's Exhibit BB–2 | —objection sustained |
| Defendant's Exhibit GG | —received |
| Defendant's Exhibit II | —received |
| Defendant's Exhibit JJ | —received |
| Defendant's Exhibit KK | —received |

## II. FACTS

The parties' numerous stipulated facts are set forth in their entirety in the pretrial order (Filing No. 31). The Court has incorporated several of the stipulations verbatim in the following findings of fact.

Members of the Lute family have been ranching in the Ogallala, Nebraska, area for nearly 100 years. Fred and Bessie Lute operated the Lute ranches in Keith and Arthur Counties on an association or contract basis. They provided land and half of the cattle, and tenants would supply labor and the other half of the cattle. For about seventy or eighty years, the tenants had been Kramers and Swansons.

Fred and Bessie Lute had three children, Robert F. Lute, Rose Sarah Lute, and Lula Lute. Rose Sarah and Lula Lute never married and had no children. Rose Sarah died in 1990 and Lula died in 1988. Robert F. Lute married Rose O'Brien Lute who died in 1981. They had one child, Robert F. Lute II, who married Kathleen M. Lute in 1987.

On July 1, 1988, Robert F. Lute, hereinafter Lute Sr., and his son Robert F. Lute II, hereinafter Lute II, executed a partnership agreement to operate the Lute family ranch and cattle business. Profits and losses were shared equally between the partners. The Partnership Agreement provided in part:

> Upon the death of a PARTNER, the Partnership business shall be continued by the surviving PARTNER for a period of three (3) years or for such time as is reasonably required by the surviving PARTNER to settle up accounts and dissolve the Partnership.

The partnership agreement also gave the surviving partner the option to purchase the deceased partner's interest.

Attorney James A. Lane first met Lute Sr. in the early 1940's. Over the years, Lute Sr. had engaged the services of Mr. Lane for business and personal reasons. Mr. Lane assisted Lute Sr. with estate planning. For instance, with the intent of keeping property out of Lute Sr.'s estate, on March 28, 1991, Mr. Lane helped Lute Sr. execute a renunciation exactly like the one at issue in this case whereby Lute Sr. renounced his intestate interest in his sister Rose Sarah Lute's estate. As a result, the property passed to Lute II. Over the years, also with the intent of reducing the value of his estate, Lute Sr. made several gifts to Lute II, particularly of land in Arthur County. By 1992, Lute Sr. had used his entire unified credit and paid gift tax on gifts to his son.

In April of 1991, Mr. Lane created a will for Lute II. Under the terms of the will, Lute II's entire estate would be placed in the "Robert F. Lute II Trust" for the benefit of his wife for her life. Kathleen M. Lute, Gene Krab, and Mr. Lane were to serve as co-trustees. After executing the will on April 24, 1991, the decedent took the original and left a copy with Mr. Lane's law office.

Sometime after the first will was executed, Lute II and Mr. Lane agreed that a second will should be prepared because the original will did not specify that the income from the trust should be paid to Kathleen M. Lute on an annual basis. Mr. Lane testified that Lute II was to revoke the first will. Mr. Lane also testified that he presumed Lute II knew how to revoke a will because Lute II had attended law school.

Before a second will was prepared, the decedent, Robert F. Lute II, a resident of Keith County, Nebraska, unexpectedly died on September 3, 1992. The decedent was born on January 19, 1944, and was forty-eight (48) years old at the time of his death. (Jt.Stip.2). The decedent, who died without issue, was survived by his father, Robert F. Lute, and his wife, Kathleen M. Lute. (Jt.Stip.3).

After Lute II's death, the original of the April 24, 1991, will could not be located. Mr. Lane testified that he concluded that Lute II had revoked the will and consequently died intestate. A copy of the will was not submitted for probate.

Lute Sr. was decimated by the news of his son's death. Mr. Lane testified that he spoke with Lute Sr. about keeping the property he was to inherit under Nebraska's laws of intestate succession out of his estate. Mr. Lane recalls Lute Sr. saying that he wanted his son's property to go to Kathleen M. Lute, and Gene Krab recalls Lute Sr. saying that "his son's property will go to Kathy or be Kathy's." Mr. Lane testified that he suggested that Lute Sr. execute a renunciation as he had done in Rose Sarah Lute's estate. Mr. Lane further testified that Lute Sr. then requested that Mr. Lane prepare a renunciation which Lute Sr. executed on September 16, 1992. The renunciation provided in part:

> The undersigned further declares that this Renunciation is an irrevocable and unqualified refusal to accept in whole or in part any and all interest in the estate of the decedent.
>
> The undersigned further states that this Renunciation is made under the provisions of the Nebraska Probate Code Section 30–2352 and under the provisions of the Internal Revenue Code Section 2518. The undersigned has not accepted any interest or benefit in, dominion over, and has not assigned, transferred nor waived the right to renounce the disclaimed property nor has such property been sold or disposed of pursuant to judicial process.

Mr. Lane testified that when Lute Sr. executed the Renunciation, Lute Sr. knew the value of the estate he was to inherit and knew what he was renouncing. Mr. Lane testified that before Lute Sr. executed the Renunciation, he, Mr. Lane, did not have any discussions with Kathleen M. Lute about it, and that she was never present when Mr. Lane and Lute Sr. discussed it. Kathleen M. Lute testified that she first saw the Renunciation when she signed and accepted it on September 16th. She also testified that prior to signing the Renunciation, she had not discussed it with anyone, and in particular she testified that Lute Sr. never discussed business with women and that she had never discussed the Renunciation with him.

Mr. Lane testified that, after the Renunciation was executed on September 16th, he spoke separately with Lute Sr. and Kathleen M. Lute. Lute Sr. advised Mr. Lane that he wanted to trade land in Arthur County for land in Keith County with Kathleen M. Lute and he wanted to get out of operating the ranch in Arthur County as he was prevented from traveling because of his age. He was approximately eighty-five (85) years old at the time. Further, Lute Sr. knew there were problems in Arthur County. The tenants were not maintaining the required number of cattle and were not paying their share of the expenses. Lute II had been trying to resolve these problems when he died.

Kathleen M. Lute advised Mr. Lane that she wanted to carry out her deceased husband's wishes as expressed in his April 24, 1991, Last Will and Testament. Both Mr. Lane and Kathleen M. Lute testified that it was her idea to place all of the property she inherited into the Robert F. Lute II Trust, and it was a voluntary act on her part.

Based on these discussions, Mr. Lane prepared, or had someone in his firm prepare, an agreement which the parties signed on September 18th and 22nd (Plaintiffs' Exhibit 103 and Defendant's Exhibit C). The Agreement provides that "it is entered into this *22nd* day of *September,* 1992."

Kathleen M. Lute testified that, before signing the Agreement on the 18th, she never spoke with Lute Sr. about its contents. She read the Agreement and understood it to mean that the partnership between Lute Sr. and Lute II was dissolved and that the ranch property in Arthur County was to be operated as it had been in the past. She understood that she was transferring all of the estate into trust. As to paragraph 6 of the Agreement, Kathleen M. Lute understood that Lute Sr. wanted out of Arthur County, and she was going to trade land in Keith County for land he owned in Arthur County.

Although Paragraph 4 of the Agreement mentions an attached trust agreement, Kathleen M. Lute testified that there was no

attached trust agreement when she signed the Agreement. Also, although Paragraph 4 mentions a probate proceeding now pending, Mr. Lane testified that the probate proceeding did not commence until September 22, 1992.

Kathleen M. Lute testified that she signed the Trust Agreement mentioned in the Agreement on September 21, 1992. The Trust Agreement reflects this, and also reflects that Mr. Lane and Mr. Krab signed it on September 22, 1992. The Trust Agreement provides that it is "made and entered into this the *22nd* day of *September,* 1992." The Trust Agreement also provides:

Trustor and Trustees recite and declare that:

1. Trustor is now the owner of all real and personal property which are assets a part (sic) of the Robert F. Lute [II] Estate now being probated in the County Court of Keith County, Nebraska, together with all property that may from time to time be held by the Trustees hereunder, is herein referred to as "TRUST ESTATE."

2. Trustor desires to make provisions for the care and management of such property, the collection of the income therefrom, and the disposition of both such income and such property in the manner herein provided.

For the reasons set forth above, and for the consideration stated in an Agreement between Robert F. Lute, Kathleen M. Lute and Gene Krab and James A. Lane, Trustees, dated the *22nd* day of September, 1992, and the mutual covenants set forth herein, Trustor and Trustees agree:

Kathleen M. Lute placed all of the property she received as part of Lute II's estate into trust. The trustees were to pay annually to Kathleen M. Lute the income and so much of the principal as deemed necessary for her health, education, support or maintenance.

On September 22, 1992, Gene Krab filed an "Application for Informal Appointment of Personal Representative in Intestacy" in the Matter of the Estate of Robert F. Lute II, No. PR02–54, with the Keith County Court. (Jt.Stip.8). On September 22, 1992, the Registrar of the Keith County Court signed and entered a "Registrar's Statement of Informal Appointment of Personal Representative in Intestacy" in the Matter of the Estate of Robert F. Lute II, No. PR02–54, with the Keith County Court. (Jt.Stip.9). James A. Lane, Gene Krab and Kathleen M. Lute are and were at all times relevant to this civil action, the duly qualified and appointed Co–Personal Representatives of the Estate of Robert F. Lute II, deceased. (Jt.Stip.4). A copy of the Renunciation, the Agreement, and the Trust Agreement were also filed with the Keith County Court on September 22, 1992.

On or about October 28, 1992, another Renunciation was recorded purporting to renounce all right, title and interest on behalf of Robert F. Lute to any life insurance on the life of Robert F. Lute II. (Jt.Stip.52). This act was in contrast to Paragraph 4 of the Agreement which stated that Lute Sr. "will receive the proceeds of any life insurance policy on the life of the DECEDENT and which contracts make ROBERT F. LUTE the beneficiary."

On March 18, 1993, Mr. Lane filed a motion in Keith County Court to seal the Agreement. The motion referenced the "Agreement dated September 22, 1992, which ... consists of recitations and personal agreements between the parties to said Agreement." County Judge Cecava testified that, when making the motion, Mr. Lane stated that he wanted to seal the Agreement because it was nobody's business but Lute business. Mr. Lane testified that he never intended to keep the IRS from looking at the Agreement. Rather, he did not want the Arthur County tenants to know its contents. Judge Cecava granted the motion on March 30, 1993. Both the motion and the order are part of the probate file.

On or about April 1, 1993, the Co–Personal Representatives of the Estate of Robert F. Lute II filed a "United States Estate (and Generation Skipping Transfer) Tax Return (Form 706)" with the Internal Revenue Service on behalf of the Estate of Robert F. Lute II. (Jt.Stip.17). They reported a total gross estate of $6,752,514.83 and a net estate of $0.00. On Schedule M filed with the return, in response to the question whether any

property passed to the surviving spouse as a result of a qualified disclaimer, the co-personal representatives answered yes. A copy of the Renunciation executed by Lute Sr. on September 16, 1992, was attached to the estate tax return.

On July 16, 199[3], the County Court of Keith County, Nebraska entered an Order ratifying the validity of the renunciation and determining that the sole heir to the estate of Robert F. Lute II was his widow Kathleen M. Lute. (Jt.Stip.53). On July 16, 199[3], the County Court of Keith County, Nebraska entered an Order Determining No Inheritance Tax Due in the Estate of Robert F. Lute II. (Jt.Stip.54).

On July 28, 1993, Lute Sr. and the co-trustees of the Robert F. Lute II Trust entered into a partnership agreement to operate the Lute family ranch and cattle business. The profits and losses were to be shared 40 percent to Lute Sr. and 60 percent to the Robert F. Lute II Trust.

On August 7, 1993, Robert F. Lute and Kathleen M. Lute, Gene Krab and James A. Lane (as Trustees of the Robert F. Lute II Trust dated September 22, 1992), entered into a Memorandum Agreement regarding certain cattle and real property located in Keith and Arthur Counties in Nebraska. (Jt.Stip.25). The Memorandum Agreement stated:

> WHEREAS, these parties wish to exchange land and cattle in order that Robert F. Lute will be the sole owner and operator of his own unit in Keith County, Nebraska, and the TRUSTEES will be the sole owners and operators of their own unit in Arthur County, Nebraska, and

> .    .    .    .    .

> WHEREAS, it is the intention of the parties to terminate the Partnership Agreement now existing between (sic) for the operation of their cattle business dated July 28, 1993, and to wind up the affairs of said partnership as between the parties on or before December 31, 1993.

The Memorandum Agreement identified all of the property to be exchanged, and the property mentioned in Paragraph 6 of the September 22, 1992, Agreement was listed as part of the identified property. On December 29, 1993, Robert F. Lute, and Kathleen M. Lute, Gene Krab and James A. Lane (as Trustees of the Robert F. Lute II Trust dated September 22, 1992), entered into a Modification to Memorandum Agreement dated August 7, 1993. (Jt.Stip.26). They added a cross option purchase provision in case the lands identified in the Memorandum Agreement were ever offered for sale.

The United States Estate (and Generation Skipping Transfer) Tax Return (Form 706) for the Estate of Robert F. Lute II was selected for examination by the Internal Revenue Service on August 19, 1993. (Jt.Stip.18).

The land identified in the Memorandum Agreement was exchanged through a series of quitclaim deeds executed on September 27, 1993, December 29, 1993, and January 3, 1994. The trustees quitclaimed the land identified in Paragraph 6 of the September 22, 1992, Agreement on September 27, 1993. The exchange was made on a dollar for dollar basis using appraised values.

On November 16, 1993, IRS Tax Attorney Judith A. Wagoner wrote to attorney James A. Lane to inform him that the federal estate tax return filed on behalf of the Estate of Robert F. Lute II had been selected for examination by the Internal Revenue Service. (Jt.Stip.23).

In the summer of 1994, Ms. Wagoner made a trip to Ogallala. She examined the probate file but did not notice the motion or order sealing the Agreement. From her investigation, she determined that the Renunciation had not been filed with the Register of Deeds in Keith and Arthur Counties.

On October 6, 1994, IRS Tax Attorney Judith A. Wagoner wrote to attorney James A. Lane inquiring about the Robert F. Lute [II] Trust dated September 22, 1992, and requesting copies of the Robert F. Lute [II] Trust Agreement. (Jt.Stip.24).

Lute Sr. died in November of 1994 at age eighty-seven (87). When he died, he was out of Arthur County and the long-running association with the Kramers and the Swansons had ended. The tenants eventually filed suit against his estate.

On or about August 31, 1995, IRS Estate Tax Attorney Wagoner wrote to attorney James A. Lane requesting a copy of the Agreement dated September 22, 1992, which had been sealed by the Keith County Court and a copy of the Last Will and Testament of Robert F. Lute II which had not been offered for probate. (Jt.Stip.36). On September 5, 1995, all of the requested information except a copy of the Agreement was provided. Plaintiff's counsel told Ms. Wagoner that it would request that the Keith County Court permit a copy of the sealed document to be given to the IRS. On September 8, 1995, Wagoner wrote to Mr. Lane requesting by September 28, 1995, a copy of the Agreement which had been sealed by the Keith County Court. On September 11, 1995, she wrote to Kathleen M. Lute as Personal Representative requesting copies of agreements concerning the operation of Lute ranches. On September 28, 1995, Attorney R. Kevin O'Donnell wrote Wagoner informing her that a hearing had bee.ı scheduled by the Keith County Court for October 24, 1995, on his request for the release of the Agreement.

On October 12, 1995, IRS Estate Tax Attorney Wagoner issued an Internal Revenue Service administrative summons to Kathleen M. Lute, personal representative of the Estate of Robert F. Lute II, deceased, for testimony and the production of books, papers, records and other data, including a copy of the Agreement dated September 22, 1992. (Jt.Stip.39).

On October 24, 1995, the County Court of Keith County, Nebraska entered an Order releasing from under seal the Agreement dated September 22, 1992. (Jt.Stip.57). On October 25, 1995, IRS Estate Tax Attorney Wagoner received a copy of the September 22, 1992, Agreement in the mail from attorney R. Kevin O'Donnell. (Jt.Stip.40).

On November 13, 1995, IRS Estate Tax Attorney Wagoner sent a letter to attorney James A. Lane regarding the "Renunciations" filed in the Estates of Rose Sarah Lute and Robert F. Lute II, deceased. (Jt.Stip.41). The letter advised Mr. Lane that because of technical issues involving the interpretation of state and federal law there was a request for a Technical Advice from

the National Office pursuant to *RevProc.* 80–21. (Jt.Stip.60).

On November 29, 1995, copies of the Renunciation signed by Robert F. Lute on September 16, 1992, together with legal descriptions of real property located in Keith and Arthur Counties, were filed with the County Clerks for Keith and Arthur Counties, Nebraska. (Jt.Stip.42). The County Clerks are ex officio the Registers of Deeds.

On March 14, 1996, based upon her examination of the federal estate tax return filed on behalf of the Estate of Robert F. Lute II, IRS Tax Attorney Wagoner recommended that an estate tax deficiency of $1,167,813 be asserted against the Estate of Robert F. Lute II. (Jt.Stip.43).

On or about April 3, 1996, Ms. Wagoner received a response to her request for technical advice from the National Office. The National Office did not issue a Technical Advice Memorandum, but rather, recommended that the issues presented nɔt be pursued because the facts created litigating hazards. In its discussion, the National Office presumed that the Renunciation, the Agreement, and the Trust Agreement were all part of the same transaction. The National Office stated that if it pursued the issues,

> we would be attempting to disallow the estate tax marital deduction for half of the estate and to impose a gift tax on the father's transfer of that interest to his daughter-in-law. We do not believe a court could be convinced to adopt such a harsh result when the property ended up in the same place it would have if the parties had been successful in probating the lost will. We reach this conclusion keeping in mind that if the lost will had been probated all of the property passing to the trust would have qualified for the marital deduction and the decedent's father would have no gift tax liability.

On April 19, 1996, Ms. Wagoner wrote the National Office asking for reconsideration. The National Office responded on April 24, 1996. The National Office stated that the issues were given consideration at the Branch and Assistant Chief Counsel levels

and that representatives of the Passthroughs and Special Industries Branch of the Office of Assistant Chief Counsel had been consulted. The National Office stated, "Based on the facts we all agreed at the time and continue to agree that it would be in the sound administration of the tax laws not to pursue the issues of disallowing a portion of the marital deduction in the decedent's estate and treating the father as having made a gift of that portion to his daughter-in-law."

On May 29, 1996, the Internal Revenue Service issued a notice of deficiency to the co-personal representatives of the Estate of Robert F. Lute II. It computed an estate tax deficiency of $1,167,813.

When determining the tax deficiency in this case, Ms. Wagoner testified that she intentionally disallowed all credit for tax on prior transfers. Ms. Wagoner disallowed the credit entirely even though some credit was owed because she says she could not determine the exact amount of the credit at that time. She also wanted to protect the government's interest. Consequently, the Estate of Robert F. Lute II had to pay some tax that was not owed and then pursue a refund. In its amended trial brief, the government concedes that the plaintiffs are entitled to credits for prior transfers in the approximate amount of $319,804.00.

When determining the tax deficiency in this case, Ms. Wagoner also disallowed approximately $427,000 in deductions from Schedule K. However, she subtracted the disallowed deductions from the gross estate when calculating the marital deduction. As a result, the government's position was maximized. The deductions were disallowed and the marital deduction was understated by $213,863. Ms. Wagoner testified that she acted intentionally in order to protect the government's interest.

On or about August 28, 1996, the Co-Personal Representatives of the Estate of Robert F. Lute II, deceased, paid the sum of $1,274,858.74 under protest as additional estate taxes and interest due from the Estate of Robert F. Lute II in connection with the estate tax deficiency proposed in the statutory notice of deficiency dated May 29, 1996. (Jt.Stip.46). The Estate of Robert F. Lute II paid Nebraska State inheritance tax in the amount of $193,386.00 on or about August 29, 1996. (Jt.Stip.62). In order to pay the tax bill, the co-trustees had to sell land in Keith County incurring brokers' fees and advertising expenses. They also had to borrow money incurring interest.

On or about August 29, 1996, the Co-Personal Representatives of the Estate of Robert F. Lute II and the Trustees of the Robert F. Lute II Trust filed a Claim for Refund and Request for Abatement (Form 843) with the Internal Revenue Service with respect to the additional estate taxes and interest paid as described above. (Jt.Stip.47). The Claim for Refund was amended on October 21, 1996, and on December 10, 1996.

Plaintiffs filed their Complaint in this civil action on March 17, 1997. (Jt.Stip.50). They have incurred attorneys fees and court costs in pursuit of a refund.

## III. DISCUSSION AND CONCLUSIONS OF LAW

The Court has original jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1346(a).

█ The Commissioner of Internal Revenue's determination of a tax deficiency is entitled to a presumption of correctness, and the burden is on the plaintiffs to prove by a preponderance of the evidence that the determination is erroneous. *Boles Trucking, Inc. v. United States,* 77 F.3d 236, 239 (8th Cir.1996).

1. *Was the Renunciation a qualified disclaimer?*

In this case, the government argues that the Renunciation executed by Robert F. Lute on September 16, 1992, was not a qualified disclaimer as defined by federal tax law. The Tax Code defines a qualified disclaimer as:

(a) **General Rule**—For purposes of this subtitle, if a person makes a qualified disclaimer with respect to any interest in property, this subtitle shall apply with re-

spect to such interest as if the interest had never been transferred to such person.

(b) **Qualified disclaimer defined**—For purposes of subsection (a), the term "qualified disclaimer" means an irrevocable and unqualified refusal by a person to accept an interest in property but only if—

(1) such refusal is in writing,

(2) such writing is received by the transferor of the interest [or] his legal representative . . . not later than the date which is nine months after . . .

(A) the day on which the transfer creating the interest in such person is made,

. . .

(3) such person has not accepted the interest or any of its benefits, and

(4) as a result of such refusal, the interest passes without any direction on the part of the person making the disclaimer and passes . . .

(A) to the spouse of the decedent[.]

I.R.C. § 2518. The government's argument that the Renunciation is not a qualified disclaimer is threefold: (1) the Renunciation was not an "irrevocable and unqualified" refusal, (2) Lute Sr. accepted the interest or its benefits, and (3) the interest did not pass without any direction on the part of Lute Sr.

■ Addressing the government's first argument, section 2518(b) requires that a qualified disclaimer be irrevocable and unqualified. These terms as used in the statute are plain and unambiguous. The requirement that a disclaimer be irrevocable and unqualified "precludes disclaimers that can be withdrawn or that are contingent on other events because in these situations the taxpayer retains a degree of control over the property, making it impossible to determine when the purported disclaimer occurs whether the property will ultimately vest in the taxpayer or some other person." 5 Boris I. Bittker and Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* ¶ 121.7.2 (1993). The ordinary meaning of the word unqualified is "without reservations." American Heritage Dictionary 742 (1983). Recently, citing a definition of unqualified from the Treasury Regulations but which this Court

cannot locate, the Fifth Circuit concluded that "[u]nder the plain meaning of the statute, an 'irrevocable and unqualified' disclaimer is a relinquishment of a legal right that is incapable of being retracted or revoked by the disclaimant and is not modified by reservations or restrictions that limit its enforceability." *Estate of Monroe v. Commissioner of Internal Revenue*, 124 F.3d 699, 708 (5th Cir.1997). In this case, the Renunciation specifically states that it is irrevocable and unqualified. There are no express reservations limiting the enforceability of the Renunciation. Thus, the Court finds that on its face, the Renunciation is irrevocable and unqualified.

Addressing the government's second argument, subsection (b)(3) requires that the person renouncing "has not accepted the interest or any of its benefits." The government argues that the Renunciation was not unqualified because it was made in return for the promises set forth in the Agreement, and thus, Lute Sr. accepted the interest or some of its benefits. The regulations explain:

A qualified disclaimer cannot be made with respect to an interest in property if the disclaimant has accepted the interest or any of its benefits, expressly or impliedly, *prior to making the disclaimer.* Acceptance is manifested by an affirmative act which is consistent with ownership of the interest in property. Acts indicative of acceptance include using the property or the interest in property; accepting dividends, interest, or rents from the property; and directing others to act with respect to the property or interest in property . . . [A] disclaimant is not considered to have accepted property merely because under applicable local law title to the property vests immediately in the disclaimant upon the death of a decedent . . . In addition, the acceptance of any consideration in return for making the disclaimer is an acceptance of the benefits of the entire interest disclaimed. (Emphasis added.)

Treas.Reg. § 25.2518–2(d)(1). The regulations explain that the disclaimant must not have (1) accepted the interest or any of its benefits, expressly or impliedly, prior to making the disclaimer, or (2) accepted any

consideration in return for making the disclaimer.

■ The Court will address the second requirement first. The government argues that Robert F. Lute received consideration in exchange for making the Renunciation. The government points out that all of the property renounced was placed in trust, that Lute Sr. continued ranching as he had prior to his son's death, and that Lute Sr. got the Lute family homestead in Keith County.

■ Consideration as used in the estate and gift tax code does not invoke the common law contract concept of consideration. *Commissioner of Internal Revenue v. Wemyss*, 324 U.S. 303, 65 S.Ct. 652, 89 L.Ed. 958 (1945); *Merrill v. Fahs*, 324 U.S. 308, 65 S.Ct. 655, 89 L.Ed. 963 (1945); *Estate of Goetchius*, 17 T.C. 495, 502, 1951 WL 236 (1951). Rather, consideration as used in the estate and gift tax code means receiving money, *see Estate of Thompson*, 89 T.C. 619, 1987 WL 45162 (1987) *rev'd on other grounds* 864 F.2d 1128 (4th Cir.1989), or something reducible to money's worth, *see* Treas.Reg. § 25.2518–2(d)(4) Ex. 2. In *Monroe v. Commissioner of Internal Revenue*, 124 F.3d 699 (5th Cir.1997), even though the twenty-eight (28) disclaimants received cash gifts in the amount of the disclaimed interest, the Court found most renunciations were valid qualified disclaimers and remand was required with regard to six (6) in order for the tax court to determine if the disclaimants received consideration in exchange for their disclaimers. In this case, Lute Sr. did not receive money or money's worth in exchange for his Renunciation. First, he received no financial benefit from the estate being placed in trust. The trust was for Kathleen M. Lute's benefit. Second, even if Lute Sr. continued ranching as he had prior to his son's death, this was in accordance with the provision of the July 1, 1988, partnership agreement pertaining to death of a partner. Lastly, the exchange of property in Keith and Arthur Counties was done on a dollar for dollar basis using appraised values. Based on the foregoing, the Court finds that Lute Sr. did not receive consideration in exchange for executing the Renunciation.

■ Next, the Court will address the first requirement which appears to be more broad than the consideration requirement. The government argues that Lute Sr., either expressly or impliedly, accepted the interest or its benefits prior to making the Renunciation because the Renunciation and the Agreement represent a single, integrated transaction under the step-transaction doctrine. The government's position necessitates a finding that the terms of the September 22, 1992, Agreement were orally agreed upon by the parties but not yet reduced to writing on September 16, 1992, when Robert F. Lute signed the Renunciation.

The government points out that if the Renunciation was really a separate transaction, then the Agreement contains numerous misstatements. For instance, there were no conflicting claims as mentioned in the first "whereas" clause of the Agreement; Lute Sr. did not have an interest in the estate as stated in Paragraph 1; Lute Sr. had already renounced instead of "will formally renounce" as set forth in Paragraph 2; the widow did not have a right to file a claim against the estate as mentioned in Paragraph 3; and the widow was already the sole heir of the estate of Robert F. Lute so the parties did not need to agree to this fact as they did in Paragraph 7. While certain language in the Agreement gives rise to an inference that the Renunciation and Agreement were not separate transactions, in order for the Court to make this finding, the Court must reject, as noncredible, the testimony of Mr. Lane and Kathleen M. Lute. They testified that there was no connection between the Renunciation and the Agreement. Specifically, Mr. Lane testified that Lute Sr. renounced his interest without first discussing it with Kathleen M. Lute, Kathleen M. Lute testified that she did not discuss the Renunciation with Lute Sr. or Mr. Lane prior to signing it on the 16th, Mr. Lane testified that Lute Sr. and Kathleen M. Lute independently expressed certain wishes to him subsequent to the Renunciation, and Mr. Lane testified that he or someone in his office drafted the Agreement after the Renunciation was executed.

The Court finds that Mr. Lane's and Kathleen M. Lute's testimony is credible, especially when considering it in conjunction with certain undisputed evidence. The undisputed evidence shows that Lute Sr. had been trying to get property out of his estate for years, that he did not discuss business with women, and that he wanted out of Arthur County because of his inability to travel and the problems with the tenants. The undisputed evidence also shows that Kathleen M. Lute wanted to establish a trust in accordance with her husband's wishes as expressed in his Last Will and Testament. This undisputed evidence coincides with Mr. Lane's and Kathleen M. Lute's testimony that the Renunciation and the Agreement were separate transactions.

The government also argues that if the Renunciation was really a separate transaction, then the plaintiffs would not have tried to conceal the Agreement from the IRS by sealing it in the probate court. The inference which could be drawn from this fact is rebutted by Mr. Lane's testimony that he did not seal the Agreement in order to keep the IRS from looking at it. Mr. Lane's testimony is credible for two reasons. First, the undisputed evidence shows that there was an on-going dispute between the Arthur County tenants and the Lutes. Mr. Lane explained that by sealing the Agreement he intended to keep the tenants from learning the contents of the Agreement because it was nobody's business except the Lutes'. Second, the Agreement was not a necessary filing in the probate estate, and Mr. Lane would never have filed it in the first place if he really wanted to conceal it from the IRS. Instead, the Agreement was open to public inspection for six months. Even after the Agreement was sealed, the motion which specifically referenced the Agreement and the order sealing the Agreement remained a part of the probate file. These filings would have revealed the existence of the Agreement to anyone who reviewed the probate file.

Based on the foregoing, the Court finds that the Renunciation and the Agreement were separate transactions and that the Agreement arose subsequent to the Renunciation. In so finding, the Court rejects the application of the step-transaction doctrine in this case. In accordance with the Court's finding of fact, the Court concludes that Lute Sr. did not accept the interest or any of its benefits prior to executing the Renunciation. The requirement of subsection (b)(3) was met.

■ Addressing the government's third argument, subsection (b)(4) requires that "the interest pass without any direction on the part of the person making the disclaimer." "[S]tate law determines whether or not a property interest has passed." *Estate of Bennett,* 100 T.C. 42, 67, 1993 WL 19583 (1993). Thus, (b)(4) would be satisfied if the Renunciation executed by Robert F. Lute was effective under Nebraska law. *Estate of Lee,* 155 Misc.2d 689, 691, 589 N.Y.S.2d 753, 755 (1992).

Although the Court believes that the Renunciation was effective under Nebraska law,[1] the Court need not decide this issue because in 1981 a new sub-section (c)(3) was added to the qualified disclaimer statute. This subsection provides:

(c) **Other rules**—For purposes of subsection (a)—

. . .

(3) **Certain transfers treated as disclaimers**—A written transfer of the transferor's entire interest in the property—

(A) which meets requirements similar to the requirements of paragraphs (2) and (3) of subsection (b), and

(B) which is to a person or persons who would have received the property had the transferor made a qualified disclaimer (within the meaning of subsection (b)), shall be treated as a qualified disclaimer.

I.R.C. § 2518(c). For interests in property created after 1981, renunciations need not be valid under state law to be a qualified disclaimer if the renunciations meet the require-

---

**1.** The Court finds that Neb.Rev.Stat. § 30–2352 (1995) does not require filing of the renunciation with the Register of Deeds within nine months of the date of death of the decedent for the renunciation to be effective.

ments of (c)(3). *Estate of Dancy v. Commissioner of Internal Revenue*, 872 F.2d 84, 85 (4th Cir.1989). When enacting (c)(3), the House Ways and Means Committee stated:

> In order to provide uniform treatment among States, the committee believes that where an individual timely transfers the property to the person who would have received the property had the transferor made an effective disclaimer under local law, the transfer will be treated as a disclaimer ... provided the transferor has not accepted the interest or any of its benefits. [Under § 2518(c)(3),] local law will be applicable to determine the identity of the transferee, but the transfer need not satisfy any requirements of the local disclaimer statute.

5 Boris I. Bittker and Lawrence Lokken, *Federal Taxation of Income, Estates and Gifts* at ¶ 121.7.6 *citing* H.R.Rep. No. 201, 97th Cong., 1st Sess. 190–91, reprinted in 1981–2 CB 352, 392. Consequently, the Court need only determine if the requirements of (c)(3) and not (b)(4) have been met. When questioned by the Court in closing argument, the government conceded this issue, and the government has not addressed the applicability of (b)(4) in its post trial brief.

In this case, subsection (c)(3)(A) is satisfied. The Renunciation meets the requirements of (b)(2) because it was given to the co-personal representatives within nine months of Lute II's death. Further, as discussed previously, the Renunciation meets the requirements of (b)(3) because Lute Sr. did not accept the interest or any of its benefits. Subsection (c)(3)(B) is also satisfied. The transfer was to a person who would have received the property had the transferor made a qualified disclaimer because under Nebraska law the surviving spouse inherits the entire intestate estate when there is no surviving parent or issue. Neb.Rev.Stat. § 30–2302. Thus, the requirements of (c)(3) have been met, and the Renunciation shall be treated as a qualified disclaimer for estate tax purposes.

The Court concludes that the plaintiffs have proved by a preponderance of the evidence that the Renunciation executed by Robert F. Lute on September 16, 1992, was a qualified disclaimer as defined by the Internal Revenue Code.

*2. Does the entire estate of Robert F. Lute II qualify for the marital deduction?*

■ For estate tax purposes, certain property of the decedent may qualify for a martial deduction. The marital deduction statute provides: "the value of the taxable estate shall ... be determined by deducting from the value of the gross estate an amount equal to the value of any interest in property which passes or has passed from decedent to his surviving spouse, but only to the extent that such interest is included in determining the value of the gross estate." 26 U.S.C. § 2056(a). The Regulations explain the phrase "passes or has passed from decedent to his surviving spouse" as used in § 2056(a). If an interest passes to a person other than the surviving spouse from a decedent and—

> (a) The person other than the surviving spouse makes a qualified disclaimer with respect to such interest in property, and
> (b) The surviving spouse is entitled to such interest in property as a result of such disclaimer, the disclaimed interest is treated as passing directly from the decedent to the surviving spouse.

§ 20.2056(d)–2. *See also DePaoli v. Commissioner of Internal Revenue*, 62 F.3d 1259, 1261 (10th Cir.1995). Under Nebraska law, an effectively renounced interest passes as if the person renouncing had predeceased the decedent, Neb.Rev.Stat. § 30–2352(c), and a surviving spouse inherits the entire intestate estate when there is no surviving parent or issue. Neb.Rev.Stat. § 30–2302.

In this case, approximately half of the estate of Lute II passed by intestacy to Lute Sr. However, Lute Sr. made a qualified disclaimer with respect to his intestate share. Consequently, under Nebraska law, Kathleen M. Lute was entitled to the disclaimed interest, and, per the regulations, the disclaimed interest is treated as passing directly from Lute II to his surviving spouse, Kathleen M. Lute. Thus, the Estate of Robert F. Lute II was entitled to deduct from the gross estate, as a marital deduction under § 2056(a), the value of the entire intestate estate which

passed from Robert F. Lute II to his surviving spouse Kathleen M. Lute.

The Court concludes that the plaintiffs have proved by a preponderance of the evidence that the tax deficiency assessed by the government was erroneous and that the entire estate of Robert F. Lute II qualified for the marital deduction.

3. *Plaintiffs' claim for attorneys fees and costs.*

The Court next addresses the issue of whether, under the applicable statute, 26 U.S.C. § 7430, the plaintiffs are entitled to an award of attorneys fees and costs. Section 7430 authorizes the Court, in an action against the United States for refund of any tax, to award reasonable litigation costs to the prevailing party. The statute expressly defines prevailing party. 26 U.S.C. § 7430(c)(4). First, a party must have substantially prevailed with respect to the amount in controversy or the most significant issue presented. In this case, the plaintiffs have done both. The Court has determined that they are entitled to a refund of the full amount of tax paid and that the Renunciation was a qualified disclaimer. Thus, the plaintiffs meet the first part of the prevailing party definition.

Next, to be a prevailing party, the statute requires the party to meet the requirements of the first sentence of 28 U.S.C. § 2412(d)(1)(B). That sentence requires:

> A party seeking an award of fees and other expenses shall, within thirty days of final judgment in the action, submit to the court an application for fees and other expenses which shows that the party is a prevailing party and is eligible to receive an award under this subsection, and the amount sought, including an itemized statement from any attorney or expert witness representing or appearing in behalf of the party stating the actual time expended and the rate at which fees and other expenses were computed.

The plaintiffs shall be given thirty (30) days from the filing of the final judgment to make such application.

However, even when a party meets the definition of a prevailing party, the Court may not treat that party as the prevailing party when the United States establishes that its position in the proceeding was substantially justified. 26 U.S.C. § 7430(c)(4)(B). This requires a review of the government's position in this case. At the request of the IRS tax attorney reviewing the Lute Estate tax returns, the National Office of the IRS recognized that if a copy of the lost will been probated, the entire estate of Robert F. Lute would have passed to Kathleen M. Lute and qualified for the marital deduction. Even though the lost will failed to state that the income from the trust be paid to Kathleen M. Lute "annually or at more frequent intervals" as required by 26 U.S.C. § 2056(b)(5), the regulations provide:

> silence of a trust instrument as to the frequency of payment will not be regarded as a failure to satisfy the condition ... that income must be payable to the surviving spouse annually or more frequently unless the applicable law permits payment to be made less frequently than annually.

Treas.Reg. § 20.2056(b)–5(e). The Court cannot find any provision in Nebraska law that would permit payment to be made less frequently than annually. Thus, the estate would have qualified for the marital deduction. *See Estate of Mittleman,* 522 F.2d 132, 140–41 (D.C.Cir.1975); *Cf. Friedman v. United States,* 364 F.Supp. 484 (D.Ga.1973). However, Mr. Lane testified that he believed that to submit a copy of the lost will to the probate court would have constituted fraud on the court based on what he knew of the facts surrounding the lost will. Consequently, he did not submit a copy of the will, and the estate passed by intestacy to Lute Sr. and Kathleen M. Lute. Lute Sr. did not want to inherit anything, so he executed a Renunciation to keep the property out of his estate. There is absolutely nothing wrong with or sinister about post death estate planning, and renunciations are a recognized means of achieving that end. As a result of the Renunciation, all of the property passed to Kathleen M. Lute. The end result under these facts is the same as if a copy of the lost will had been probated. The entire estate passed to the surviving spouse. This was, in

effect, the position taken by the National Office. Not happy with this response, the examining tax attorney requested a reconsideration from the National Office and again was advised that it would be improvident to proceed with a tax deficiency claim. This did not deter the examiner, who then proceeded to assess an Estate tax deficiency and included in that deficiency amounts which she knew exceeded the liability of the Estate. This action required the Estate to raise money to pay taxes which the government knew were not owed.

In addition, the government did not fully evaluate the estate and gift tax law defining consideration and apply it in this case. As discussed previously, consideration as used in the gift and estate tax code contemplates money or money's worth. Second, the government relied upon inference and innuendo to argue that Lute Sr. accepted the interest or its benefits, specifically, the language of the Agreement and the fact that it was sealed in the probate court, and ignored the explanations of the parties involved. Based on the foregoing, the Court concludes that the government's position was not substantially justified and the plaintiffs will be treated as the prevailing party.

## IV. CONCLUSION

The plaintiffs have proved by a preponderance of the evidence that the tax deficiency issued in this case is erroneous. They have proved that the Renunciation is a qualified disclaimer, and thus, the decedent's entire estate qualifies for the marital deduction. They are entitled to reasonable attorneys' fees and costs. A separate judgment will be entered in accordance with this opinion.

## MEMORANDUM AND ORDER

This matter is before the Court on the defendant's motion to alter or amend judgment (Filing No. 54). This estate tax refund suit was tried to the Court. The Court ruled in favor of the plaintiffs and determined that the estate was entitled to recover reasonable litigation costs as defined in 26 U.S.C.

§ 7430(c)(1) because it was the prevailing party as defined in 26 U.S.C. § 7430(c)(4). The defendant challenges the Court's finding that the estate is a prevailing party.

For the first time, the defendant argues that in order to be a prevailing party, the statute requires, among other things, that the plaintiffs "meet[ ] the requirements of section 2412(d)(2)(B) of such title 28 (as so in effect)." 26 U.S.C. § 7430(c)(4)(A)(ii) (Supp. 1998). That section provides in relevant part:

> "party" means (i) an individual whose net worth did not exceed $2,000,000 at the time the civil action was filed, or (ii) any owner of an unincorporated business, or any partnership, corporation, association, unit of local government, or organization, the net worth of which did not exceed $7,000,000 at the time the civil action was filed, and which had not more than 500 employees at the time the civil action was filed.

28 U.S.C. § 2412(d)(2)(B) (Supp.1998). The defendant argues that the net worth of the estate as reflected on the federal estate tax return is $6,153,322.55, and therefore, the estate is not a party entitled to recover reasonable litigation costs.[1]

There are two issues presented: first, which net worth limitation should apply to the estate? Second, did the estate exceed the applicable net worth limitation at the time the civil action was filed?

■ In response to the first inquiry, the estate argues that the $7 million net worth limitation should apply citing *Boatmen's First National Bank of Kansas City v. United States,* 723 F.Supp. 163 (W.D.Mo.1989). Therein the parties agreed that the estate of Edward M. Douthat was not an individual and the $2 million net worth limitation did not apply. In this case, however, there is no such stipulation and the defendant argues to the contrary. As the defendant's brief points out, many courts have concluded that an estate is subject to the $2 million net worth limitation applicable to individuals. *See, Estate of Woll,* 44 F.3d 464, 468 (7th Cir.1994);

---

**1.** The government does not argue that because the term "estate" is not listed in section 2412(d)(2)(B) an estate cannot be a party entitled

to recover attorneys fees. (Government's Brief at 6 citing authority to the contrary).

*Miller v. United States,* 926 F.Supp. 642, 644 n. 2 (N.D.Ohio 1996); *Rao v. United States,* 987 F.Supp. 249 (S.D.N.Y.1997). The Court concludes that the majority view is correct since the estate arises from the death of an individual and consists of that individual's assets and liabilities. Accordingly, the $2 million net worth limitation applies in this case in determining whether the Estate is the "prevailing party" as defined by the statute.

■ In response to the second issue, whether the estate exceeded the applicable net worth limitation at the time the civil action was filed, the defendant calculates a net worth of $6,153,322.55. The plaintiff argues that this calculation is incorrect because the acquisition cost of property should be used to calculate net worth.

Many courts have looked to legislative history for guidance with respect to calculating net worth. *United States v. 88.88 Acres of Land,* 907 F.2d 106, 107 (9th Cir.1990); *Continental Web Press, Inc. v. National Labor Relations Board,* 767 F.2d 321, 323 (7th Cir. 1985); *Swanson v. Commissioner,* 106 T.C. 76, 94, 1996 WL 62615 (1996). The legislative history expressly provides:

> "Net worth" is calculated by subtracting total liabilities from total assets. In determining the value of assets, the cost of acquisition rather than fair market value should be used.

H.R.Rep. No. 1418, 96th Cong.2d Sess. 15 (1980), 1980 U.S.C.C.A.N. 4984, 4994. Based on the legislative history, the Court will calculate net worth using the acquisition cost of property.

■ The plaintiff further argues that insurance on the decedent's life should be excluded from the net worth calculation, (see *Estate of Rao, supra),* because it is a survivorship agreement payable to beneficiaries

other than the estate (Exhibit A at n. 1). Using the acquisition cost of real estate and excluding the life insurance, the plaintiff arrives at a net worth of less than $2 million (Plaintiff's Brief at 3 and Ex. A).

The Court agrees that including life insurance payable at the decedent's death to a beneficiary should not be included in the net worth calculation.[2] Such funds are not available to the estate to fund a lawsuit against the government, and including them in the net worth calculation would undermine the purpose of the EAJA.

After plugging the acquisition cost of the real estate into the defendant's net worth calculation (Defendant's Brief at 3–4) and excluding the insurance on the decedent's life as noted, the Court arrives at a net worth less than $2 million.[3] Thus, the estate is not prohibited from recovering reasonable litigation costs by the applicable net worth limitation.

■ The defendant also challenges the Court's finding that the position of the United States in this judicial proceeding was not substantially justified. *See* 26 U.S.C. § 7430(c)(4)(B) and (c)(7) (Supp.1998). The "substantially justified" standard:

> presses the agency to address the problem of abusive and harassing regulatory practices. It is intended to caution agencies to carefully evaluate their case and not to pursue those which are weak or tenuous. At the same time, the language of the section protects the government when its case, though not prevailing, has a reasonable basis in law and fact. Furthermore, it provides a safety valve where unusual circumstances dictate that the government is advancing in good faith a credible, though novel, rule of law.

---

**2.** Schedule D reflects a total of $821,978.95 in life insurance. Of that amount, $706,574.41 clearly was payable to Kathleen M. Lute, Beneficiary, and the Court will not include that amount in the net worth calculation. However, the Court will include the remainder of $115,404.55 because Lute Sr. renounced his interest in the life insurance proceeds and the inventory filed in the probate court reflects such amount as an asset of the estate.

**3.** Assets of $2,301,043.53 (acquisition cost of real estate $746,974.98, stocks and bonds $12,233.21, mortgages, notes and cash $758,749.69, life insurance payable to the estate $115,404.55, jointly owned property 126,750.00, and other miscellaneous property $540,931.10) less liabilities of $599,192.26 equals $1,701,851.27.

**1062**

H.R.Rep. No. 1418, 96th Cong.2d Sess. 14 (1980), (1980 U.S.C.C.A.N. 4984, 4993). The phrase "position taken by the United States in the civil proceeding" is interpreted in the Eighth Circuit to encompass only the government's in-court litigating position. *Wickert v. Commissioner*, 842 F.2d 1005, 1008 (8th Cir.1988).

The government persuasively argues that the Court incorrectly considered pre-litigation conduct in making its determination that the position of the United States was not substantially justified. However, after fully reviewing the memorandum opinion, the Court is satisfied that it correctly determined that the position of the United States in this judicial proceeding was not substantially justified.

On December 11, 1997, in the pretrial conference order, the United States submitted the following to the Court as a controverted or unresolved issue:

> Whether the taxpayer, the Estate of Robert F. Lute II, is entitled to credits for prior transfers in the approximate amount of $270,900.65 in connection with prior transfers from the Estates of Lula L. Lute and Rose Sarah Lute, as reported on Schedule Q of the federal estate tax return filed on behalf of the Estate of Robert F. Lute II, deceased.

Filing No. 31 at ¶ 6. Approximately one and a half months later and approximately a week before trial, the United States had investigated its position sufficiently to concede:

> Lastly, the Estate of Robert F. Lute II is entitled to credit with respect to the taxes paid in connection with the transfer of property from the Estates of Lula Lute and Rose Sarah Lute to the decedent, Robert F. Lute II. The amounts of these credits have been tentatively calculated by the Internal Revenue Service as $39,040 and $280,764, respectively.

Amended Trial Brief at 65. Thus, the position of the United States on this issue up until trial was not properly investigated, evaluated, or supported.

In addition, the position of the United States on the qualified disclaimer issue was not substantially justified. For the reasons

set forth in its memorandum opinion at pages 20–25 and 32, the Court found the defendant's position that Lute Sr. had "not accepted the interest or any of its benefits" prior to renouncing as required by 26 U.S.C. § 2518(b)(3) to not have a reasonable basis in law and fact. The defendant's position on this issue was weak or tenuous. Further, the defendant maintained up until closing argument that the qualified disclaimer at issue had to meet the requirements of 26 U.S.C. § 2518(b)(4). The United States never mentioned subparagraph (c)(3) which provides that certain transfers will be treated as qualified disclaimers without meeting the requirements of (b)(4). (Filing No. 52 at 27). For these reasons, the Court finds that the position of the United States was not substantially justified. Accordingly,

IT IS ORDERED:

1) The defendant's motion to alter or amend judgment (Filing No. 54) is denied.

2) The plaintiff shall by June 5, 1998, file documents in support of its application for attorneys fees and costs.

3) The defendant shall file its response within ten days thereafter.